**William T. SPENCE, Plaintiff,**

v.

**BALOGH & COMPANY, Inc., Defendant.**
**Civ. A. No. 1757–61.**

United States District Court
District of Columbia.
July 26, 1962.

Cornelius H. Doherty, Washington, D. C., for plaintiff.

Alan Y. Cole, Alan L. Wurtzel, Washington, D. C., for defendant.

JONES, District Judge.

In this action plaintiff seeks to require defendant to deliver 6220 shares of stock of the Northern Virginia Doctors Hospital Corporation (Hospital) and to pay $15,000 for reimbursement of monies expended and attorneys fees or, alternatively, to recover money damages totaling $201,600. The Court, following the trial of the action, has ascertained the following to be the facts and has concluded as indicated hereinafter:

In 1958 Hospital entered into an underwriting agreement with defendant, then known as the Matthews Corporation, by the terms of which Matthews Corporation agreed to use its "best efforts" to sell 16,500 shares of Hospital's common stock to the public at $10.00 per share, with Matthews Corporation receiving a commission or compensation of $1.50 per share for each and every share sold. On March 10, 1959 an amendment to the underwriting agreement was entered into between Hospital and Matthews Corporation by the terms of which the latter agreed to use its "best efforts" to sell 8503 shares of Hospital's common stock to the public at $10.00 per share with Matthews Corporation to receive as compensation or commission 15% of the sale price of the stock sold. Both the underwriting agreement and the amendment thereto expressly stated that Matthews Corporation did not warrant, underwrite, guarantee or in any way promise or covenant to sell or purchase any of the securities either for its own account or for the account of others. On June 1, 1959, Matthews Corporation changed its name to Balogh & Company.

While the amendment to the underwriting agreement was in effect, plaintiff, a physician, on August 3, 1959, made an offer to purchase 6220 shares of the Hospital's common stock for the offering price of $10.00 per share. This offer was made to defendant, which unconditionally accepted the offer not later than 5:30 P.M. on that date. Sometime after 10:30

P.M. on August 3, 1959, Hospital's board of directors revoked the underwriting agreement, as amended, with the notice of revocation being received by defendant on the morning of August 4, 1959.

On August 6, 1959, plaintiff, defendant's president, and others, delivered a certified check in the sum of $62,200 to Riggs National Bank, the transfer agent of the Hospital, together with a letter of instructions directing the transfer agent to issue the 6220 shares of stock to five physicians including plaintiff in the amounts indicated. The Riggs National Bank advised plaintiff, defendant's president and the others that it had closed the Hospital's stock transfer books in accordance with instructions received from Hospital and had returned to Hospital all blank stock certificates in its possession and that it was therefore unable to deliver the 6220 shares of Hospital's stock pursuant to the letter of instructions.

Plaintiff contends that defendant sold 6220 shares of stock to plaintiff on August 3, 1959 as the principal and not as an agent and that therefore defendant should either be required to deliver the 6220 shares of Hospital's common stock to plaintiff or, alternatively, pay plaintiff damages. Plaintiff contends that an August 4, 1959, written confirmation by defendant to O'Donnell, agent for plaintiff and four other physicians, is evidence that defendant was acting as a principal in the sale of 6220 shares of stock. That written confirmation by reference to a code number stated that defendant was acting as principal and for its account and that it confirmed the sale accordingly.

■ Expert witnesses testified that it was the practice in the investment business in the District of Columbia to so confirm sales when the broker was acting as a "best efforts" underwriter in the sale of securities for an issuer. As has been noted, both the underwriting agreement and the amendment thereto specifically provided that defendant would only be required to use its "best efforts" to sell Hospital's securities and that it did not warrant, underwrite, guarantee, or in any way promise or covenant to sell or purchase any of the securities of issuer. A "best efforts" underwriting makes the investment dealer an agent for the issuer and not a principal. Securities & Exchange Comm. v. Investment Bankers of America, 181 F.Supp. 346, 348, n. 4 (D., D.C., 1960).

■ Plaintiff testified that he was familiar with both the underwriting agreement and the amendment thereto; that when defendant and Hospital entered into them, he was an officer and director of the Hospital. Moreover, in September, 1959, plaintiff and three other physicians instituted an action in the Arlington County, Virginia, Circuit Court against Hospital to require it to issue the 6220 shares to them. In the complaint signed by plaintiff it was stated that defendant was Hospital's underwriting agent. And in a May 1960 letter to Hospital's president, plaintiff asserted that on August 3, 1959, he purchased the 6220 shares "from the agent of the (Hospital) corporation, Balogh & Company." Plaintiff knew that defendant was serving as an agent of a disclosed principal. Under such circumstances the agent is not liable. International Trading Corporation v. Edison, 71 App.D.C. 210, 211, 109 F.2d 825 (1939), cert. denied 310 U.S. 652, 60 S. Ct. 1099, 84 L.Ed. 1417 (1940); Haskins Bros. & Co. v. Morgenthau, 66 App.D.C. 178, 182, 85 F.2d 677 (1936), cert. denied 299 U.S. 588, 57 S.Ct. 118, 81 L.Ed. 433, Restatement, Agency (2nd Ed. 1958) Section 320.

■ Plaintiff alternatively contends that if defendant was not the principal at the time of the August 3, 1959 sale of Hospital's stock to plaintiff, defendant subsequently became plaintiff's agent and, by failing to acquire the 6220 shares of Hospital's stock for plaintiff, defendant is liable for the breach of its agency contract. There is nothing in the record that evidences either an express or an

implied agency agreement between plaintiff and defendant.

■ But even if there had been an agency relationship subsequent to August 3, 1959, there was no evidence that defendant failed in its duty to the plaintiff. On September 1, 1959, plaintiff and three other physicians brought suit in the Circuit Court of Arlington County, Virginia, against the Hospital Corporation and the then president and secretary of that corporation. In that action plaintiff and the three other physicians sought to require the Hospital and its officers to issue certificates of stock in accordance with their purchase order of August, 1959. A petition to intervene was filed in that action by other parties who claimed they had a prior right to the 6220 shares of stock under a subscription agreement entered into between them and the Hospital. The Virginia Circuit Court dismissed the action brought by the plaintiff and the three other physicians. Plaintiff appealed that decision to the Supreme Court of Virginia which, in January, 1961, affirmed the Circuit Court.

At approximately the same time that the Virginia action was instituted, the $62,200 purchase price of the shares was placed in escrow by defendant in the First National Bank of Arlington pending the outcome of the Virginia litigation. This was done at the request of the plaintiff and the other physicians, who at no time have requested defendant to return the money to them.

While the Virginia litigation was pending, discussions were had by plaintiff and others with representatives of the Hospital with respect to obtaining the 6220 shares of stock. In April, 1960, counsel for the Hospital advised counsel for plaintiff that the Hospital would issue 5850 shares of its stock to plaintiff. This letter resulted in a meeting attended by plaintiff, his counsel, president of defendant, and two or three of the other physicians. While the evidence is conflicting as to the reason for not accepting the Hospital's offer of 5850 shares, plaintiff testified that he did not direct defendant to take up that number of shares. And plaintiff independent of defendant did not accept the 5850 shares. Rather counsel for plaintiff replied to counsel for Hospital suggesting a meeting of counsel, plaintiff and officers of the Hospital for the purpose of working out an amicable settlement. At that time defendant's president understood that defendant would be advised by plaintiff's counsel as to what action should be taken concerning the acquisition of the shares of stock.

Thereafter Riggs National Bank advised defendant that as of the close of business on April 18, 1960, it would have available 6220 shares of Hospital stock for issuance in accordance with the letter of instructions given to the Riggs National Bank in August, 1959. Upon receipt of that letter, an attorney for defendant inquired of the Bank and also of the president of the Hospital as to the transfer agent's authority to issue the 6220 shares of stock to the plaintiff and the other physicians. Copies of those letters requesting such information were sent to counsel for the plaintiff. The information sought by the attorney for the defendant was never furnished by either the Bank or the Hospital. However, plaintiff was notified by the Hospital that at the close of business on April 25, 1960, the transfer books of the corporation would be closed and that unless plaintiff paid for and took up the 6220 shares of stock by that time the offer to make the shares available would be withdrawn. While both plaintiff and his counsel saw the notice from the Hospital on April 25 prior to the close of business, defendant was never made aware of that information by plaintiff, his counsel, or anyone else until some date subsequent to April 25. Plaintiff did not pay the purchase price within the time provided and he has not received the shares of stock.

The attorney for defendant was justified in seeking advice with respect to the authorization for the transfer of the 6220 shares of stock and the payment of the $62,200 for the same. That money was being held in escrow pending the outcome of the Virginia litigation. In

April, 1960 the litigation was still pending. In the litigation intervenors had asserted a prior right to the 6220 shares of stock. If defendant had been the agent of plaintiff at the time, its attorney was exercising the due care that would be expected of the defendant under the circumstances. Plaintiff would have no valid claim against defendant even if it had been the agent of plaintiff subsequent to August 3, 1959.

In view of the disposition of this case, consideration need not be and has not been given to defendant's contentions that plaintiff is not the real party in interest and that the Arlington, Virginia, litigation was conclusive of the rights asserted here by plaintiff.

Judgment for defendant. This memorandum is to serve as the findings of fact and conclusions of law of the Court.

Counsel for defendant will present appropriate order.